ORIGINAL

FILED IN CHAMBERS
U.S.D.C. Atlanta

NOV 15 2019

JAMES N. HATTEN, Clerk
Deputy Clerk

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

IN RE: APPLICATION OF THE
UNITED STATES OF AMERICA
FOR AN ORDER PURSUANT TO
18 U.S.C. § 2703(d)

Criminal Action
No. 1:19-MJ-989

## APPLICATION OF THE UNITED STATES
## FOR AN ORDER PURSUANT TO 18 U.S.C. § 2703(d)

The United States of America, by Byung J. Pak, United States Attorney for
the Northern District of Georgia, and Katherine I. Terry, Assistant United States
Attorney, respectfully submits this *ex parte* application for an Order pursuant to
18 U.S.C. § 2703(d).  The proposed order would require Google LLC, an
electronic communications service provider located in Mountain View,
California, to disclose certain records and other information pertaining to the
following Google account:

**The SUBJECT ACCOUNT:** montrezegoodwin0704@gmail.com, as further
described in Part I of Attachment A to the proposed order.

The records and other information to be disclosed are described in Part II of
Attachment A. In support of this application, the United States asserts:

### Legal Background

1.    Google LLC is a provider of an electronic communications service,
as defined in 18 U.S.C. § 2510(15), and/or a remote computing service, as defined

in 18 U.S.C. § 2711(2). Accordingly, the United States may use a court order issued under § 2703(d) to require the company to disclose the items described in Part II of Attachment A. *See* 18 U.S.C. § 2703(c)(2) (corresponding to Part II(A) of Attachment A); 18 U.S.C. § 2703(c)(1) (corresponding to Part II(B) of Attachment A).

2.      This Court has jurisdiction to issue the proposed order because it is "a court of competent jurisdiction," as defined in 18 U.S.C. § 2711. *See* 18 U.S.C. § 2703(d). Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated. *See* 18 U.S.C. § 2711(3)(A)(i). Applicant certifies that the Atlanta Division of the Drug Enforcement Administration ("DEA") is conducting a criminal investigation involving, but not limited to, the suspected user(s) of the SUBJECT ACCOUNT, concerning violations of federal laws, including Title 18, United States Code, Section 1951 (attempted Hobbs Act robbery), Title 18, United States Code, Section 924(c)(1)(A) (brandishing and discharging a firearm during a crime of violence), and Title 18, United States code, Section 111(a)(1) & (b), and there are reasonable grounds to believe that the contents of the requested records and information are relevant and material to an ongoing criminal investigation.

3.      A court order under § 2703(d) "shall issue only if the governmental entity offers specific and articulable facts showing that there are reasonable grounds to believe that the contents of a wire or electronic communication, or the records or other information sought, are relevant and material to an ongoing

criminal investigation." 18 U.S.C. § 2703(d). Accordingly, the next section of this application sets forth specific and articulable facts showing that there are reasonable grounds to believe that the records and other information described in Part II of Attachment A are relevant and material to an ongoing criminal investigation.

## The Relevant Facts

**October 8, 2019 robbery and shooting**

*Attempt to conduct a controlled purchase*

      4.      On October 8, 2019, agents with the Atlanta-Carolina's High Intensity Drug Trafficking Area Program ("HIDTA"), Group 4, attempted to conduct a controlled purchase of nine ounces of crack cocaine and nine ounces of cocaine at 1090 Hollywood Road, Atlanta, Georgia 30318 from a member of a drug trafficking organization.  Agents utilized a Confidential Source (CS)[1] to attempt to conduct the purchase.  The CS has purchased drugs from this drug trafficking organization on previous occasions.  On this particular date, the agents arranged for the CS to purchase nine ounces of crack cocaine and nine ounces of cocaine from Caojo Detori STEWARD, also known as "DBOY," for

---

[1] Agents have utilized this CS since approximately January of 2019.  During this time, agents have used him/her to conduct drug buys, as well as to identify drug traffickers and residences utilized by drug traffickers.  The CS has a criminal history of domestic violence and misdemeanor drug offenses.  Agents have been able to verify most of the information provided by the CS and found him/her generally reliable.  However, during the course of this investigation, the CS misidentified a photograph of one of the potential suspects.

$18,000 (using official advanced funds ("OAF")).  The CS had arranged to meet STEWARD at Unit 209 of 1090 Hollywood Road, Atlanta, Georgia to exchange OAF for the narcotics.

5.    At approximately 4:00 p.m., the agents drove the CS to the meet location and dropped the CS off at Hollywood Road and Brooks Avenue, Atlanta, Georgia.[2] Agents equipped the CS with a recording device.  The CS walked to Unit 209 and knocked on the door.  An individual, who agents believe to be STEWARD, based on listening to the transmission of the CS's body-bug, the CS's statements following the attempted deal, and witness identifications (more fully described below), opened the door to Unit 209.  The CS then tried to initiate the deal.

6.    At approximately 4:12 p.m., a brown Acura TSX drove into the lot and parked in front of Unit 209.  Agents saw a man wearing a white shirt and khaki pants, identified as Jeron Damani GEORGE after his arrest, exit the passenger seat of the Acura TSX, greet the CS, and retrieve a black bag with colored print from the backseat of the vehicle.[3] Agents observed GEORGE then enter Unit 209 with the black bag.  At approximately 4:15 p.m., agents observed

---

[2] Prior to this controlled buy, agents searched the CS for contraband and money and found none.  Agents also suited the CS with a body-bug at this time, which would allow agents to hear any conversations during the course of the controlled buy.  Agents confirmed the body-bug was in working order at that time.
[3] Previously, agents believed the bag was a small black bag taken out of the trunk of the vehicle.  Based on further review of surveillance videos, agents now believe the bag was removed from the back seat of the vehicle and is described as a mostly black bag with colored print.

GEORGE exit Unit 209, empty handed, and enter the passenger seat of the Acura TSX. The Acura quickly departed the area. While this occurred, the CS remained on the front porch area of Unit 209. Agents saw STEWARD walking back and forth between the front porch area and inside Unit 209. During the course of these events, agents were approximately 40-50 yards away.

*Assault of CS*

7.      At approximately 4:26 p.m., while listening to the CS's body- bug, agents heard STEWARD say that he was cooking it up (referring to narcotics) and it would take approximately 30 minutes. Moments later, agents heard and saw the CS give the pre-arranged verbal and visual danger signals. Three men, William RIVERS, Demetrius LEWIS, and Montrese GOODWIN, pointed firearms at and physically assaulted the CS.[4] The men took the black bag[5] the CS was carrying; inside was the $18,000 cash for purchasing the drugs. The CS also said the men took his/her personal cellphone.

---

[4] Agents on scene saw two black males, one wearing a red shirt and black pants (Unidentified Male "UM" 2), and the other wearing a white shirt (UM3), physically assaulting the CS. Surveillance footage from a local convenience store and from a DVR inside Unit 209 has since been reviewed. Both surveillance videos show three men approaching the CS. Based on the investigation to date, agents believe the men are William RIVERS, Demetrius LEWIS, and Montrese GOODWIN.

[5] The CS was carrying a black, medium-sized bag with a shoulder strap.

8.      Agents converged on the scene once they realized the CS was being robbed.  Agents[6] drove into the parking lot between building 200 and building 100.  Based on the investigation to date, including multiple surveillance videos and witness statements, RIVERS, GOODWIN, and LEWIS ran away from Unit 209 as agents arrived in two separate vehicles.  RIVERS ran past the staircase nearby Unit 209, toward the alleyway, followed by GOODWIN and LEWIS.  All three men ran around the corner and into the alleyway, away from Hollywood Rd.  While running through the alley, LEWIS appeared to trail behind GOODWIN and RIVERS.  LEWIS then stopped in the alleyway and picked something up off the ground, then continued running.  All three men ran toward the southern corner of the property, away from Hollywood Rd NW.

9.      A DEA vehicle then arrived on scene and turned right, following RIVERS and GOODWIN.  GOODWIN continued to run as RIVERS appeared to get into a shooting-type stance and began to fire at the DEA vehicle.  LEWIS stopped short, and turned right in between buildings 200 and 300 and ran towards the front entrance to the apartment complex, located on Brooks Ave.  As LEWIS ran towards the entrance of the apartment complex, a second DEA vehicle entered the complex.  LEWIS immediately began to fire a handgun at the DEA vehicle as he ran by the vehicle and out the front of the complex towards Brooks Ave.  At approximately the same time, RIVERS ran back toward the

---

[6] At this time, there were two agent vehicles.  Inside one vehicle was one agent and inside another vehicle there were multiple agents.  Both vehicles were unmarked and neither were employing blue lights or sirens.

middle of the complex, through the alley, and turned left to head in the direction of Units 209 and 211. RIVERS appears to be stumbling at times, possibly due to his gunshot wound. RIVERS eventually went into Unit 211, along with STEWARD and the person renting Unit 211, Emmanuel Morrell.[7]

**Post-shooting detention and search of the apartments**

*Execution of search warrants for Unit 209 and Unit 211*

10.    In the early morning hours of October 9, 2019, agents obtained federal search warrants for Unit 209 and Unit 211. Agents executed both search warrants on that same date. A few minutes after the search warrants were executed, but before agents made entry, Emmanuel Morrell exited Unit 211. Morrell was detained and later released. Then agents approached Unit 211 and RIVERS said he was unable to exit without assistance due to his gunshot wound. Agents escorted RIVERS out of Unit 211 and RIVERS was detained.

11.    In Unit 209, agents located approximately 100 grams of suspected cocaine inside a black backpack in the master bedroom closet. This black backpack is similar to the bag agents observed GEORGE carry into apartment 209. In the master bedroom, agents located an Ak-47 rifle and a magazine filled with ammunition. In the living room, agents located suspected crack cocaine, suspected cocaine, suspected marijuana, an undetermined amount of United States Currency, and a Glock handgun. The cocaine field-tested positive for the

---

[7] Morell appears to be a resident of apartment 211, based on vehicle registration and information provided to law enforcement by Morrell.

presence of cocaine.  All the drugs will be sent to a DEA laboratory for further analysis.   Additionally, a Digital Video Recorder ("DVR") system was seized from apartment 209 and later found to contain surveillance footage taken from cameras believed to belong to STEWARD.  It appears that the cameras are in multiple locations on the exterior of 209 and the footage from the cameras was saved onto the DVR.   In Unit 211, agents located a Ruger handgun in one of the bedrooms.

**Identification of GOODWIN**

*Interview with witness to the shooting on October 11, 2019*

12.     On October 11, 2019 agents spoke with a witness to the shooting. The witness told agents that he/she was walking from building 1 and, as he/she turned the corner, three black men walked past him/her: one in a white shirt and two others in dark clothing.  The witness continued walking toward building 3. Several minutes later, while the witness was at the top of the steps of building 3, he/she heard shots fired.  The witness turned to look and saw the black man in the white shirt shooting at a mustang (one of the DEA undercover vehicles). Agents showed the witness a still photograph from the surveillance video, but the witness said he/she did not recognize any faces, only recalled seeing the white shirt.  Based on the investigation to date, agents believe the man in the white shirt shooting at the DEA undercover vehicle is LEWIS.

*2nd Source of Information[8] – identification of GOODWIN*

     13.    Several days after the shooting, agents interviewed a second source of information (SOI-2)[9] regarding his/her knowledge of the shooting that occurred on October 8, 2019, and any individuals involved in the incident.  SOI-2 told agents that he/she had received information from multiple sources that there had been an attempted robbery for $18,000 at the direction of "D" (STEWARD) and a subsequent shooting.   He/she had been told that William (RIVERS), "Junior" (LEWIS), and "Man-Man" (GOODWIN) had been involved in the robbery.  SOI-2 said that he/she had heard that RIVERS had been shot during the robbery, but that LEWIS and GOODWIN had not yet been arrested. SOI-2 also heard that GOODWIN may have the money that was stolen that day and that he had possibly been shot.

     14.    SOI-2 said that he/she knew GOODWIN (who he/she referred to as "MAN-MAN") and his girlfriend, "Blessing" (who was later identified as Blessing Heard).  SOI-2 had previously seen GOODWIN and Heard in the area of

---

[8] A 1st Source of Information "SOI-1" provided information regarding other parts of the investigation that are not included in application.

[9] SO1-2 is not receiving payment or reduction of charges for speaking with law enforcement.  SOI-2 may be hoping for a reduction in criminal charges for another, but has not been promised anything for speaking with law enforcement. SOI-2 has a lengthy criminal history, including felony convictions for identity theft fraud and financial transaction card fraud.  SOI-2 also has arrests within the last five years for theft by receiving stolen property and entering an automobile, but no dispositions are listed.

2500 Center Street, Atlanta, GA 30318.   SOI-2 did not know the current whereabouts of GOODWIN.

15.     SOI-2 was later shown a Georgia driver's license photograph of Heard and confirmed that the female in the picture was "Blessing" and that she was the girlfriend of GOODWIN.  SOI-2 was shown multiple surveillance photographs taken from the DVR of the male believed to be GOODWIN, but was unable to determine who the male in the photograph was due to the quality of the photograph.  SOI-2 later provided a photograph from a WSB-TV 2 online news article regarding a jewelry theft in Gwinnett County, GA that was posted on or about April 19, 2019.  SOI-2 identified one of the suspects pictured in the news article as GOODWIN.  The male in the photograph identified as GOODWIN by SOI-2 was a black male, with facial hair around his mouth, and wearing a dark colored zip-up hooded sweatshirt on, a white undershirt, and a black beanie.

*4th Source of Information[10] – identification of GOODWIN*

16.     Agents interviewed a fourth source of information ("SOI-4")[11] regarding his/her knowledge of the shooting that occurred on October 8, 2019.

[10] A 3rd Source of Information "SOI-3" provided information regarding other parts of the investigation that are not included in this application.
[11] SO1-4 is not receiving payment or reduction of charges for speaking with law enforcement.  SOI-4 may be hoping for a reduction in criminal charges for another, but has not been promised anything for speaking with law enforcement. SOI-4 has a lengthy criminal history, including felony theft, drug, and damage to criminal property convictions. SOI-4 also has a felony conviction for financial

SOI-4 told agents that he/she knew that three men, "Junior" (LEWIS), "Boots" (RIVERS), and "Man-Man" (GOODWIN), were involved in the attempted robbery and subsequent shooting. SOI-4 told agents that he/she had seen LEWIS (whom he/she referred to as Junior) on October 8, 2019 and LEWIS was wearing a blue and yellow Golden State Warriors baseball cap, a plain white shirt, and blue jeans.[12]

17.     Agents then showed SOI-4 several photographs associated with this investigation. Agents showed SOI-4 multiple surveillance photographs taken from the DVR of the man believed to be GOODWIN, but SOI-4 was not able to determine who the male in the photograph was due to the quality of the photograph. SOI-4 was then shown a photograph taken from Heard's Instagram page and confirmed that he/she recognized the female in the photograph from the 2500 Center Street apartments (suspected to be the same apartment complex at which SOI-2 has seen GOODWIN and Heard previously), but did not know her name. SOI-4 was then shown the photograph taken from the WSB-TV 2 news article, as described above. SOI-4 confirmed that the male in the photograph could be GOODWIN, but that he/she was not sure.

---

transaction card theft. SOI-4 has an arrest for willful obstruction, but does not appear to have a conviction.

[12] SOI-4 gave this description before he/she was shown the surveillance video of the incident, discussed below.

*Tip regarding GOODWIN and subsequent review of surveillance footage*

18.    On October 20, 2019, agents received a tip that GOODWIN and

Heard had been observed at a gas station located at 490 Whitehall Street SW,

Atlanta, GA 30303 in a gray Pontiac Grand Prix on the evening of October 19,

2019, between approximately 11:10pm and 11:20 p.m.  On October 21, 2019,

agents obtained surveillance footage from the gas station for the aforementioned

date and time.  The surveillance footage is taken from multiple cameras at the

property and dated and timestamped on October 19, 2019 from approximately

11:31 p.m. to 11:34 p.m[13].  The footage shows a gray Pontiac Grand Prix pull into

the gas station and out of view of the surveillance camera.  Another camera angle

shows a black male (believed to be GOODWIN) get out of the back seat of the

Pontiac from the passenger side and a black female (believed to be Heard) come

around the rear of the vehicle toward GOODWIN.  At that time, it appears the

male is wearing a gray or white hooded sweatshirt with black or dark colored

print on the front with the hood up, light colored pants, and royal blue and white

tennis shoes.  Throughout several points in the footage, it appears the male may

be injured and is limping.  The female appears to be wearing dark colored pants,

a gray or blue shirt, and a red jacket with white stripes around the cuffs of the

---

[13] While obtaining the surveillance footage a few days following October 19,
2019, agents noticed that the time on the computer system appeared to be
approximately 43 minutes slow.  The store employee was questioned about the
discrepancy of time, but was unable to provide a reason or if it did indeed affect
the timing on the actual footage.

sleeves.   The male and the female then walk toward the gas station store and enter the store together.  The male goes to the counter and appears to attempt to buy something.  While the male is standing at the counter, he repeatedly leans on the counter and appears to be holding his left leg up slightly while putting more weight on his right leg.  The male stands there for a moment then walks out of view of the camera away from the front entrance to the store.  Shortly thereafter, you see the male walk out of the store.  An outside camera then shows the male outside of the store and he appears to be talking on a cellphone and throwing his hands in the air.  Based on the footage, the cellphone appears to be white with a camera slot directly in the center of the back of the phone.  The female then walks out of the store and toward where the male was standing.  At that time, she is covering her face.  Both the male and the female then walk toward the parking lot/street and out of view of the camera.  The gray Grand Prix then appears to pull toward the street and out of view.

19.     SOI-2 was later shown a still photograph of the female taken from the surveillance footage from the aforementioned date.  SOI-2 confirmed that he/she couldn't tell completely, but that it could be Heard.

**Arrest of GOODWIN and identification of the white LG phone, telephone number 678-536-8547**

*Surveillance, identification of, and detention of GOODWIN on October 22, 2019*

20.     On October 22, 2019, agents conducted surveillance at the Days Inn located at 4498 Washington Road, East Point, GA 30344.  At approximately 10:35

AM, agents observed GOODWIN exit the front door of the hotel with another black male and walk toward the parking lot. At that time, it appeared that GOODWIN was talking on a cellphone as agents observed him holding what appeared to be a white cellphone up to one of his ears. Shortly thereafter, agents approached GOODWIN and detained him along with the other male subject identified as Joaquin Brian Hollie (hereafter referred to as "Hollie") who walked out of the Days Inn with GOODWIN. Upon detaining both subjects, the first male provided his name of Montrese GOODWIN. GOODWIN was then fingerprinted through a law enforcement database and the results positively identified him as "Montrese Dentay Goodwin."

21.     Hollie then provided his name and was also fingerprinted through a law enforcement database and the results positively identified him as "Joaquin Brian Hollie." Hollie's response returned with arrest warrants.

*Location of the white LG phone, telephone number 678-536-8547*

22.     Both GOODWIN and Hollie were searched incident to arrest, at which time GOODWIN was found to not have any cellphones in his possession and Hollie was found to have a white LG cellphone, with a cracked screen, bearing IMEI 358852100773235 and assigned telephone number 678-536-8547 and a black and silver iPhone S in his possession. According to agents on scene, Hollie claimed the black and silver iPhone was his. According to agents on scene, when questioned about the white LG cellphone, using number #8547, Hollie appeared hesitant in his response, but claimed that phone was also his.

23.     At approximately 11:29 AM, agents Mirandized GOODWIN who, at that time, agreed to speak with agents without a lawyer present.  GOODWIN then told agents that he came to the hotel to visit one of his cousins. He said that he was currently staying at a residence off of Cleveland and provided the address of 2952 Grand Avenue, SW, Atlanta, GA.  On the same date, a search warrant was executed at the residence where GOODWIN claimed he had been staying located off of Grand Avenue.  During the course of the search, consent was given to law enforcement on scene to conduct a search of a cellphone belonging to and in the possession of one of the residents present.  The resident indicated that a contact listed in the phone as "Man Boobie," with phone number 678-536-8547, was GOODWIN's phone number.

**Administrative subpoena regarding the white LG phone, identifying the SUBJECT ACCOUNT**

24.     On November 6, 2019, agents received administrative subpoena results from T-Mobile regarding the IMEI number listed on the back of the white LG phone with the cracked screen.  The results indicate that the IMEI was attached to telephone number (678) 536-8547, subscribed to "MONTREZ GOODWIN" at 206 Howell Dr., SW, Atlanta, GA 30331.  The phone number with the IMEI was activated on or about October 9, 2019, and deactivated on or about October 22, 2019 and the phone model on file was listed as a LG Stylo 5 WHT.  Therefore, the phone number was activated a day after the assault, robbery, and shooting incident and was deactivated on the day GOODWIN was arrested.

*Interview with Hollie on October 31, 2019, and confirmation of the white LG phone,*
*telephone number 678-536-8547, used by GOODWIN*

25.     On October 31, 2019, agents conducted an interview with Hollie
regarding his knowledge of the white LG phone that was seized from him on
October 22, 2019.  During the interview, agents asked Hollie if the white LG
phone was GOODWIN's and Hollie confirmed that it was.  Agents then asked
Hollie how he obtained the white LG phone from GOODWIN.  Hollie explained
that when he and GOODWIN were detained, they were directed to sit down on a
bench.  When Hollie and GOODWIN sat down on the bench, GOODWIN's
phone fell to the floor.  At that time, GOODWIN asked Hollie if Hollie could get
GOODWIN's phone.  Hollie explained that he then asked law enforcement
personnel on scene to get his phone that was on the floor, inferring that it
belonged to Hollie.  Agents conducting the interview then asked if Hollie had
informed law enforcement personnel on October 22, 2019, that the white LG
phone was his (Hollie's) phone and he confirmed that he had.

26.     Agents then continued the interview and asked Hollie if he saw
GOODWIN using the white LG phone prior to both of them being detained on
October 22, 2019 and Hollie explained that he did not know, but that it did end
up on the ground when GOODWIN sat down on the bench.  Hollie then
informed agents that the black and silver iPhone seized from him on the day that
he was detained was, indeed, his (Hollie's).

*Search of the white LG phone, telephone number 678-536-8547, and the Identification of the SUBJECT ACCOUNT*

27.     On November 7, 2019, agents obtained a federal search warrant to search the contents of the white LG phone, telephone number 678-536-8547.  On the same date, agents conducted a search.    During the search, agents identified the SUBJECT ACCOUNT as the email account linked to the white LG phone, telephone number 678-536-8547.  Based on agents training and experience, multiple cellular telephones can be linked to the same email address.

28.     Based on the above stated facts regarding the activation of the white LG phone, telephone number 678-536-8547 on October 9, 2019, agents believed GOODWIN used a different cellular telephone during the events that occurred on October 8, 2019.  Thus, records for the previous phone used by GOODWIN may be stored in the Google account for the SUBJECT ACCOUNT. These records could include additional telephone numbers used by GOODWIN, IP login information, subscriber information, and billing records.

29.     This order requires Google LLC to identify subscriber information and any associated Google account identifiers, including the Google or email address associated with the SUBJECT ACCOUNT described in Part I of Attachment A.

### Information about Google[14]

30.     Google provides a variety of on-line services, including electronic mail ("email") access, to the public.  Google allows subscribers to obtain email accounts at the domain name gmail.com.  Subscribers obtain an account by registering with Google.  During the registration process, Google asks subscribers to provide basic personal information.  Therefore, the computers of Google are likely to contain stored electronic communications (including retrieved and unretrieved email for Google subscribers) and information concerning subscribers and their use of Google services, such as account access information, email transaction information, and account application information. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users. As part of its services, Google offers a suite of various applications that are collectively accessed by the subscriber under a single Google account.  Google collects and retains a wealth of data relating to the use of these various applications.

31.     A Google subscriber can also store with the provider files in addition to emails, such as address books, contact or buddy lists, calendar data, pictures (other than ones attached to emails), and other files, on servers maintained and/or owned by Google.  Email providers generally ask their

---

[14] The information in this section is based on information published by Google on its website, including, but not limited to, webpages linked to Google Help, available at https://support.google.com.

subscribers to provide certain personal identifying information when registering for an email account. Such information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative email addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number). Such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

32.     Email providers typically retain certain transactional information about the creation and use of each account on their systems. This information can include the date on which the account was created, the length of service, records of log-in (i.e., session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account. In addition, email providers often have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the email account.

## Request for Order

33.     The facts set forth in the previous section show that there are reasonable grounds to believe that the records and other information described

in Part II of Attachment A are relevant and material to an ongoing criminal investigation. Specifically, these items will help the United States to identify and locate the individual(s) who are responsible for the drug conspiracy and drug trafficking crimes described above, and to determine the nature and scope of their activities. Accordingly, the United States requests that Google LLC be directed to produce all items described in Part II of Attachment A to the proposed Order.

Date: November 15, 2019

BYUNG J. PAK
*United States Attorney*

KATHERINE I. TERRY
*Assistant United States Attorney*
Georgia Bar No. 229887
600 U.S. Courthouse
75 Ted Turner Dr., S.W.
Atlanta, GA 30303
404-581-6000; Fax: 404-581-6181

## ATTACHMENT A

### I.   The Account(s)

The Order applies to certain records and information associated with the following accounts and any Google accounts linked to the subject accounts by cookies, creation IP address, recovery email address, or telephone number:

    a.  **SUBJECT ACCOUNT:** montrezegoodwin0704@gmail.com.

### II.   Records and Other Information to Be Disclosed

Google is required to disclose the following records and other information, if available, to the United States for each account identified in Part I of this Attachment (the "Account"), for the time period September 1, 2019 to October 22, 2019:

A. The following information about the customers or subscribers of the Account:

1. Names (including subscriber names, user names, and screen names);

2. Addresses (including mailing addresses, residential addresses, business addresses, and email addresses);

3. Length of service (including start date) and types of service utilized;

4. Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

5. Any telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic

Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"), Mobile Identification Numbers ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), International Mobile Subscriber Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI"));

5. Other subscriber numbers or identities (including temporarily assigned network addresses and registration Internet Protocol ("IP") addresses (including carrier grade natting addresses or ports));

6. Any associated Google account identifiers, including Google Accounts tied to the SUBJECT ACCOUNT, or email address;

7. Means and source of payment for such service (including any credit card or bank account number) and billing records;

8. Identify any accounts linked to the subject account by cookies, creation IP address, recovery or forwarding email address, or telephone number;

9. Android hardware information for the device;

10. Cellular service carrier/provider for the Android device; and

11. Applications the user has downloaded to the Android device.

B. All records and other information (not including the contents of communications) relating to the Account, including:

    1.    Records of user activity for each connection made to or from the Account, including log files; messaging logs; the date, time, length, and method of connections; data transfer volume; user names; and source and destination Internet Protocol addresses;

    2.    Information about each communication sent or received by the Account, including the date and time of the communication, the method of communication, and the source and destination of the communication (such as source and destination email addresses, IP addresses, and telephone numbers); and

    3.    Records of any Google accounts that are linked to the SUBJECT ACCOUNT by cookies (meaning all Google LLC user IDS that logged into Google LLC by the same machine as the SUBJECT ACCOUNT).

**End of Attachment A**

# CERTIFICATE OF AUTHENTICITY OF DOMESTIC BUSINESS RECORDS PURSUANT TO FEDERAL RULE OF EVIDENCE 902(11)

I, _____, attest, under penalties of perjury under the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this declaration is true and correct. I am employed by Google LLC ("Google"), and my official title is

_____. I am a custodian of records for Google. I state that each of the records attached hereto is the original record or a true duplicate of the original record in the custody of Google, and that I am the custodian of the attached records consisting of _____ (pages/CDs/kilobytes). I further state that:

a.   all records attached to this certificate were made at or near the time of the occurrence of the matter set forth, by, or from information transmitted by, a person with knowledge of those matters;

b.   such records were kept in the ordinary course of a regularly conducted business activity of Google; and

c.   such records were made by Google as a regular practice.

I further state that this certification is intended to satisfy Rule 902(11) of the Federal Rules of Evidence.

_____          _____

Date                                                  Signature